UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
L & L ELECTRONICS, INC., ET AL.,

    Plaintiffs

    v.        CIVIL ACTION NO.:
               10-10083-EFH

M/V OSPREY, Official No. 976694 Her
Engines, Machinery, Tackle, Apparel,
Appurtenances, etc., *in rem,*

    Defendant.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
TROPICAL AIRCRAFT COMPANY, LTD.,

    Plaintiff-in-Counterclaim,

    v.

L & L ELECTRONICS, INC. and ESSEX
BOAT WORKS, INC.,

    Defendants-in-Counterclaim.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
TROPICAL AIRCRAFT COMPANY, LTD.,

    Plaintiff-in-Cross-Claim,

    v.

M/V OSPREY, Official No. 976694 Her
Engines, Machinery, Tackle, Apparel,
Appurtenances, etc., *in rem,*

    Defendant-in-Cross-Claim.
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

February 16, 2011

HARRINGTON, S.D.J.

This matter comes before the Court after a one day, non-jury trial. Plaintiffs and defendants-in-counterclaim are L&L Electronics, Inc. ("L&L") and Essex Boat Works, Inc. ("Essex"). Tropical Aircraft Company, LTD ("Tropical") is the plaintiff-in-counterclaim and the plaintiff-in-cross-claim. The Motor Vessel *Osprey* is the defendant and the defendant-in-cross-claim. Having heard the testimony of the witnesses and considered those exhibits which were admitted at trial, and having heard the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

Findings of Fact:

Watersedge Group, LLC ("Watersedge") was formed as a Connecticut limited liability company on January 15, 2008. John H. Baxter ("Baxter") signed the Articles of Organization and was listed as Watersedge's organizer, resident agent, President and CEO. Cornelius B. Prior, Jr. ("Prior") became a member and manager of Watersedge at about the time of its formation in January of 2008. Prior made an equity contribution to Watersedge of $350,000 at the time he became a member and made additional equity contributions to Watersedge consisting of a $300,000 equity infusion in April 2008, a $100,000 equity infusion in June 2008, and a final equity infusion of $100,000 in October 2008. Prior owned eighty (80%) percent of Watersedge and Baxter owned the remaining twenty (20%) percent.

Watersedge's business plan was to provide customers access to a fleet of luxury yachts on a time-share basis. Watersedge purchased the motor vessel *Osprey* on or about March 27, 2008. Watersedge was the record owner of the *Osprey* at all times relevant to this dispute until the date of the court-ordered interlocutory sale on June 4, 2010. Watersedge also purchased one other vessel, the *Osprey II*, that is not the subject of this dispute.

2

Between March and June of 2008, Prior made loans to Watersedge evidenced by a secured note.[1] Prior made three advances under the secured note totaling $916,004.40. Specifically, he advanced $363,750 on March 29, 2008 in connection with the purchase of the *Osprey*; $348,750 on April 25, 2008 in connection with the purchase of the *Osprey II*; and $203,504.40 on June 19, 2008 in connection with improvements to both vessels.

The loans were secured by a first preferred ship mortgage on the *Osprey* in the maximum principal amount of $1,250,000.00 (the "Mortgage"). The Mortgage was filed with the U.S. Coast Guard Documentation Center on April 2, 2008. On November 19, 2008, Prior made an additional $100,000 loan to Watersedge secured by the mortgage and evidenced by a supplemental secured note. Prior assigned his interests in the loan notes and the mortgage to Tropical on June 16, 2009. Prior is the President and sole shareholder of Tropical. The assignment was filed with the U.S. Coast Guard Documentation Center on August 12, 2009.

In March of 2008, Robert Jarrett ("Jarrett") was hired as a Senior Vice President of Watersedge. In or about March and early April of 2008, Jarrett, on behalf of Watersedge, entered into an agreement with L&L whereby L&L would install certain electronics on the *Osprey*. Jarrett asked L&L to allow for certain payments to be deferred because Baxter was waiting to receive his next funding check from his "partner in the Islands," referring to Prior. L&L performed the contracted work. Watersedge made an initial $12,000.00 down-payment but failed to pay a remaining balance of $26,720.30 for the work performed in June and July of 2008. L&L has a valid maritime lien for necessaries in that amount. L&L's maritime lien arose

---

[1] On or about December 1, 2008, the original secured note was amended and restated in its entirety in the principal amount of $950,862.83, which included the principal sum then outstanding under the original note together with unpaid interest and fees associated with overdue payments as of that date.

3

after the Mortgage was recorded on April 2, 2008.  The Court finds that there was no fraud or misrepresentation with respect to Jarrett's statements.

In or about early April of 2008, Baxter, on behalf of Watersedge, entered into an agreement with Essex whereby Essex would perform certain work on the *Osprey*.  Baxter told Essex that Prior was the "backer" or "money man" that would be financing Essex's work.  Essex performed the work pursuant to the agreement.  Watersedge, however, failed to pay Essex $54,253.22 for the work billed between May 29, 2008 and September 22, 2008.  Essex has a valid maritime lien for necessaries in that amount.  Essex's maritime lien arose after the Mortgage was recorded.  The Court finds that there was no fraud or misrepresentation with respect to Baxter's statements.

Throughout the existence of the company, Prior did not exercise any control over the daily operations of Watersedge.  The management of the daily operation was Baxter's responsibility.  Prior had no responsibility with respect to the management of Watersedge and had no dealings with vendors or contractors providing goods or services to Watersedge, including L&L and Essex.  Prior did not use the *Osprey* or other assets of Watersedge for personal purposes.  No evidence was introduced as to Watersedge's revenues or expenses with respect to its operations.

In March through June of 2009, Watersedge failed to make loan payments to Prior and defaulted on the notes.  On or about June 3, 2009, Prior resigned as a manager of Watersedge and declared the notes to be in default and accelerated the balances due.  In mid-June of 2009, Watersedge ceased operations and, in late 2009, Tropical, having been assigned the Mortgage, took possession of the *Osprey* pursuant to the terms of the Mortgage.  Watersedge filed articles

of dissolution on November 12, 2009. The principal, interest and late charges outstanding on Tropical's secured notes is $724,785.24.

On February 5, 2010, the *Osprey* was placed under arrest by the United States Marshal Service. On or about June 4, 2010, the United States Marshal conducted the Interlocutory Sale of the *Osprey*. Tropical purchased the *Osprey* at the sale for $140,000.00. Tropical deposited the full purchase amount in the registry of this Court and has received title to the *Osprey*.

Conclusions of Law:

Under the Ship Mortgage Act, Tropical's first preferred ship mortgage would ordinarily take priority over L&L and Essex's maritime liens. See 46 U.S.C. § 31326(b)(1). L&L and Essex, however, contend that the Mortgage should not take priority under the so-called "stranger to the vessel" doctrine. The "stranger to the vessel" doctrine dictates that owners of a vessel, or those that have authority over a vessel such that they are in a similar position to owners, are denied maritime liens. Sasportes v. M/V Sol De Copacabana, 581 F.2d 1204, 1208-09 (5th Cir. 1978) ("When the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself."); See also Medina v. Marvirazon Compania Naviera, S.A., 709 F.2d 124, 125 (1st Cir. 1983) (per curiam) (recognizing that those who hold authority over the vessel are not legally entitled to hold maritime liens thereon). L&L and Essex argue that the doctrine, <u>which applies to maritime liens</u>, should be extended to prohibit owners from holding preferred ship mortgages.[2]

---

[2] L&L and Essex cite Sec. Pac. Nat'l Bank v. O.S. Pac. Pride, 549 F. Supp. 53 (W.D. Wash. 1982) and Bergren v. Davis, 287 F. Supp. 52 (D. Conn. 1968), for the proposition that the "stranger to the vessel" doctrine has previously been applied to preferred ship mortgages. In Sec. Pac Nat'l Bank, the court denied summary judgment to the mortgage holders on the issue of priority. 549 F. Supp. at 55. While the court mentioned the proposition that owners may not obtain maritime liens, the court recognized that the issue with respect to mortgages was novel

5

They assert that Prior and Tropical should, therefore, not be able to hold a preferred ship mortgage in the *Osprey* since Prior is also a member and manager of Watersedge, the owner of the *Osprey*.

The Court shall not extend the "stranger to the vessel" doctrine to preferred ship mortgages. The "stranger to the vessel" doctrine was developed in the limited context of maritime liens. As the First Circuit has noted:

> [M]aritime liens and the admiralty jurisdiction that comes with them are a way of making the provision of services to vessels as safe and predictable as the provision of services to land-based businesses. A creditor with a maritime lien, not unlike the holder of a materialman's lien, can seek payment even if the person she negotiated with has absconded. The overarching goal is keeping the channels of maritime commerce open -- by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation.

Mullane v. Chambers, 438 F.3d 132, 138 (1st Cir. 2006). The purpose of a maritime lien, therefore, is to encourage the provision of goods and services, especially in distant ports, by providing an In rem claim against the vessel itself should the party controlling the vessel's affairs abscond. Id. Since owners are the ones that control the vessel's affairs, or have access to the entity that controls the vessel's affairs, they do not require such a mechanism. See id. The "stranger to the vessel" doctrine, accordingly, exists to exclude owners from the protection of maritime liens.

---

and concluded that the case should proceed to trial since such transactions may lend themselves to fraud or collusion. See id. at 54-55. The court did not explicitly hold that the "stranger to the vessel" doctrine applied to mortgages. See id. Furthermore, the situation at hand is different since here, there has been a trial with no finding of fraud or collusion. Bergren is even less relevant as it does not involve the application of the "stranger to the vessel" doctrine to a mortgage. See 287 F. Supp. at 56. In Bergren, the court merely permitted a mortgage to be challenged on the ground of failure of consideration. Id. at 55-56. Here, there is no such challenge. Both cases, therefore, do not support L&L and Essex's contention and are otherwise irrelevant.

By contrast, the purpose of a mortgage is to encourage private investment by protecting creditors in the cases of default. See Custom Fuel Services, Inc. v. Lombas Indus., Inc., 805 F.2d 561, 569 (5th Cir. 1986). There is no similar justification, as there is with maritime liens, for excluding owners from such protection. Rather, affording owners the protection of a mortgage directly facilitates private investment. An owner that lends money to his or her own venture may feel just as dubious about the venture's success as a stranger. As the United State Court of Appeals for the Fifth Circuit has observed, "[a] shareholder may lend money to a wholly-owned corporation and become a bona fide creditor." Id. at 565. While such transactions are subject to scrutiny by the courts, a finding of fraud, unfair dealing, or other inequitable conduct is required to deem a preferred ship mortgage invalid or subordinate. Id. Here, there is no such finding. The Court, therefore, holds that Prior's status as a member and manager of Watersedge on its own is insufficient to render the preferred ship mortgage invalid or subordinate to L&L and Essex's maritime liens.

The Court also notes that preferred ship mortgages are distinct from maritime liens in that preferred ship mortgages must be recorded in order to be valid while maritime liens need not be recorded. See P.R. Ports Auth. v. Barge KATY-B, 427 F.3d 93, 104 (1st Cir. 2005) ("A maritime lien is silent and need not be recorded in order to retain its vitality."); 46 U.S.C. § 31343 (providing for permissive recording of a maritime lien); 46 U.S.C. § 31321 (mandating that mortgages be recorded). A party contracted to provide necessaries to a vessel, therefore, may be unaware that the owner doing the contracting also holds a maritime lien against the ship should the enterprise fail. Here, L&L and Essex were on constructive notice of Prior's interest

7

in the *Osprey* before they commenced their services. The priority of preferred ship mortgage must, therefore, be sustained absent fraud, unfair dealing, or other inequitable conduct.[3]

The Court concludes that Tropical's first preferred ship mortgage takes priority over L&L and Essex's maritime liens. Tropical is, therefore, entitled to the full amount of the proceeds of the sale of the *Osprey*. The Court orders that Tropical be awarded the $140,000.00 plus any interest thereon that may have accrued.

SO ORDERED.

/s/ Edward F. Harrington
EDWARD F. HARRINGTON
United States Senior District Judge

---

[3] While not pressed at trial, L&L and Essex raise three additional issues in their papers. First, L&L and Essex contend that the Mortgage should be equitably subordinated to the maritime liens because Watersedge is undercapitalized and a mere instrumentality of Prior and Tropical. Second, L&L and Essex argue that Prior and Tropical will be unjustly enriched if the mortgage is given priority over the liens because Prior knowingly waited until L&L and Essex had finished working on the *Osprey* before foreclosing. Lastly, L&L and Essex argue that their liens should have priority over the mortgage as a result of the tortious conduct of the vessel and its agents. The Court finds that there is no evidence supporting these contentions.